UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 10-61668-Civ-COOKE/TURNOFF

FREDDY A. RAMIREZ CARDOZA,

    Plaintiff

vs.

SPIRIT AIRLINES, INC.,

    Defendant.

_____/

## OMNIBUS ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before me on Spirit Airlines, Inc.'s Motion for Summary Judgment (ECF No. 44) and Plaintiff's Motion for Partial Summary Judgment (ECF No. 46). I have reviewed the arguments, the record, and the relevant legal authorities. For the reasons provided, both of the Motions are denied.

### I. BACKGROUND

This is a personal injury action arising from a death aboard a Spirit Airlines, Inc. ("Spirit") flight. Plaintiff, Freddy A. Ramirez Cardoza, as personal representative of the estate of Gertrudis Cardoza-Sori, filed a one-count Complaint for absolute liability under Article 17 of the Montreal Convention.

Unless otherwise noted, the following facts are undisputed.[1] On September 26, 2009, Gertrudis Cardoza-Sori flew on Spirit flight 716 from Santo Domingo, Dominican Republic, to Fort Lauderdale-Hollywood International Airport. Ms. Cardoza-Sori was a diabetic and anemic forty-seven year-old female with a history of congestive heart failure and hypertension, among other

---

[1] The facts set forth in each party's respective Statement of Undisputed Facts are deemed admitted to the extent that they are supported by evidence in the record, and are not specifically disputed in an opposing statement of facts. S.D. Fla. L.R. 7.5(D); *see also Gossard v. JP Morgan Chase & Co.,* 612 F. Supp. 2d

ailments. Although many of the details are in dispute, it appears that at some point during the flight, Ms. Cardoza-Sori collapsed. A Spirit flight attendant responded to the situation; believing the condition to relate to her diabetes, the flight attendant went to the rear galley to get orange juice for Ms. Cardoza-Sori. When she returned with the juice, Ms. Cardoza-Sori was unresponsive.

Flight attendants obtained medical and personal information about Ms. Cardoza-Sori from her father and aunt, who were also passengers on the flight. Flight attendants obtained assistance from a Spanish-speaking passenger to obtain her medical history. Flight attendants also made a call for medical assistance over the P.A. system. Dina Cuevas, who identified herself as a nurse, responded. Ms. Cuevas and certain flight attendants moved Ms. Cardoza-Sori from a seating position to a lying position across three seats. At least one flight attendant performed CPR on Ms. Cardoza-Sori.

Although the precise timeline is unclear, at some point, Ms. Cardoza-Sori involuntarily expelled the urine in her bladder. She was lying in a position in which she was touching metal from the seatbelts and the armrests. Spirit states that flight attendants, pursuant to their training, decided not to use the onboard Automated External Defibrillator ("AED") because the passenger was wet and touching metal. According to Ms. Cuevas, she asked flight attendants for an AED, but they did not give it to her. Ms. Cuevas also stated that the level of moisture that urine causes would not have prevented her from using the AED, and that it was "not at all" difficult to move Ms. Cardoza-Sori to the floor.

The parties agree that the flight attendants relayed information to the pilots, who contacted MedLink, a service through which Spirit flight crews obtain guidance in resolving a medical emergency. According to Spirit's company policy, MedLink physicians determine whether it is necessary to divert a plane's flight path to respond to a medical emergency.

---

1242, 1245-1246 (S.D. Fla. 2009).

It appears that initially the flight attendants indicated to the pilots that there was a "potential problem" on the plane. At that point, the flight was approximately 80 miles southeast of Nassau, Bahamas. Flight attendants then made a second call to the pilots to inform them that there was a "medical emergency" on the plane. Upon that information, the pilots made contact with Medlink. The initial patch between the pilots and Medlink happened at 10:24 a.m. At around that time, the flight began its descent into Fort Lauderdale. The captain and officer discussed diverting the plane to Nassau, Bahamas, or Miami, Florida, but decided not to do so. The captain and first officer did not discuss the possibility of diversion with a MedLink physician. The MedLink physician never advised the pilots to divert the flight. The pilots decided to land in Fort Lauderdale.

Paramedics treated Ms. Cardoza-Sori upon arrival in Fort Lauderdale, but determined she was not breathing and had no pulse. Paramedics did not use an AED. An EKG reading showed no cardiac activity. According to the Broward County Medical Examiner, who performed the autopsy on Ms Cardoza-Sori, the immediate cause of death was severe hypertensive cardiovascular disease, i.e., cardiac arrest. Boiko Dep. 27:1-29:16.

The parties have filed cross motions for summary judgment on whether Spirit is liable under Article 17 of the Montreal Convention. The central issue is whether the facts in this case constitute an "accident" as defined under Article 17 of the Montreal Convention.

## II. LEGAL STANDARDS

A court "shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of [Rule 56(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Rule 56(c) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### III. ANALYSIS

#### A. The Montreal Convention

Article 17 of the Montreal Convention, which superseded the Warsaw Convention, imposes liability on an aircraft carrier when an "accident" causes a passenger's death or bodily injury in an international flight. Article 17 of the Convention provides that a carrier

> shall be liable for damage sustained in the event of the death or bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Convention for the Unification of Certain Rules for International Carriage by Air, art. 17, 49 Stat. 3018 ("Montreal Convention"). Recovery for a personal injury suffered onboard an international flight, or in the course of embarking or disembarking, "if not allowed under the Convention, is not available at all." *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 162 (1999). The Convention therefore provides an exclusive cause of action for injuries sustained on an international

4

flight. *See id*.

To satisfy Article 17, a plaintiff must establish three requirements: "(1) an 'accident' must have occurred; (2) injury or death must have occurred; and (3) the preceding two conditions must have occurred while 'embarking or disembarking' or during the flight itself." *Marotte v. Am. Airlines, Inc.*, 296 F.3d 1255, 1259 (11th Cir. 2002). An accident is "an unexpected or unusual event or happening that is external to the passenger," and not "the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft." *Air France v. Saks*, 470 U.S. 392, 405-06 (1985). "This definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Id*. at 405. A flight crew's inaction may constitute an "accident." *Olympic Airways v. Husain*, 540 U.S. 644, 656 (2003).

Courts have not resolved what weight to give industry standards and company policies in determining what constitutes an "unexpected or unusual event." *See, e.g.*, *Caman v. Continental Airlines, Inc.*, 455 F.3d 1087, 1091 n.4 (9th Cir. 2006) ("We recognize that there are questions as to whether an air carrier's departure from an industry standard or its own company policy is 'unexpected' for the purpose of defining an Article 17 'accident.'"). The Fifth Circuit has held that an air carrier's departure from industry standard or its own company policy is not a *per se* "unexpected or unusual event," which constitutes an "accident." *Blansett v. Continental Airlines, Inc.*, 379 F.3d 177, 181-82 (5th Cir. 2004) ("[W]e will not depart from the demonstrated will of the Supreme Court by creating a *per se* rule that any departure from an industry standard of care must be an 'accident.'"). However, "[s]ome departures from an 'industry standard' might be qualifying accidents under Article 17." *Id*. At least one court has held that "any *major* deviation" from industry standards may qualify as an "accident." *See Fulop v. Malez Hungarian Airlines*, 175 F. Supp. 2d 651, 665 (S.D.N.Y. 2001) (emphasis added). Courts in the Eleventh Circuit appear to at least consider industry standards and company policies in determining whether an event is

5

"unexpected or unusual." *See, e.g.*, *McDowell v. Continental Airlines, Inc.*, 54 F. Supp. 2d 1313, 1318 (S.D. Fla. 1999) (noting that medical kit onboard was in compliance with FAA regulations).

### B. Assessment of Circumstances of Ms. Cardoza-Sori's Death

Plaintiff identifies three "accidents," which caused Ms. Cardoza-Sori's death: (i) Spirit did not make an announcement to see if there was a physician aboard the plane; (ii) Spirit did not attempt to use its onboard AED to revive Ms. Cardoza-Sori; and (iii) Spirit and its pilots did not divert to a "closer" airport, but continued to its intended destination, Fort Lauderdale-Hollywood International Airport. Compl. ¶¶ 17-19. Because an injury is "the product of a chain of causes," a passenger is only required "to prove that some link in the chain was an unusual or unexpected event external to the passenger." *Saks*, 470 U.S. at 406. "In cases where there is contradictory evidence, it is for the trier of fact to decide whether an 'accident' . . . caused the passenger's injury." *Id*. at 405.

It is clear that Plaintiff meets the latter two elements of Article 17—the parties agree that Ms. Cardoza-Sori suffered bodily injury aboard an international Spirit flight, which resulted in death. The critical issue is whether any of the three events Plaintiff identifies constitute an "accident" for purposes of the Montreal Convention.[2]

The evidence is indisputable that the first event Plaintiff identifies did not occur as Plaintiff alleges in his Complaint. Both parties agree, after the benefit of discovery, that when Ms. Cardoza-Sori became ill, Spirit flight attendants made a call over the P.A. system requesting medical

---

[2] Ms. Cardoza-Sori's cardiac arrest, alone, does not constitute an "accident" under the Montreal Convention. *See Saks*, 470 U.S. at 398 ("[T]he text of Article 17 refers to an accident *which caused* the passenger's injury, and not to an accident which *is* the passenger's injury." (emphasis in original)); *see also Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1520 (11th Cir. 1997) ("In the absence of proof of abnormal external factors, aggravation of a pre-existing injury during the course of a routine and normal flight should not be considered an 'accident' within the meaning of Article 17."); *Rajcooar v. Air India Ltd.*, 89 F. Supp. 2d 324, 328 (E.D.N.Y. 2000) ("The Supreme Court has defined an 'accident' as 'an unexpected or unusual event or happening that is external to the passenger.' . . . A heart attack does not meet that definition, as it is not external to the passenger.").

6

assistance. *See* Def. Statement of Material Facts ¶ 5(c). Ms. Dina Cuevas, who identified herself as a nurse, responded to the call. *Id*.

There are genuine issues of material fact with respect to the second event Plaintiff identifies. Plaintiff argues that Spirit's failure to use its onboard AED to revive Ms. Cardoza-Sori constitutes an "accident" under the Montreal Convention. Spirit contends this does not constitute an "accident" because the flight attendants properly followed Spirit's policies and industry standards. Spirit argues that it is not "unexpected or unusual" for a flight attendant to refrain from using an AED on a passenger who is wet and touching metal. In support, Spirit provides a physician's affidavit who avers that the "use of the AED is contraindicated in a patient who is wet or in contact with metal surfaces" and "[u]sing an AED in that circumstance could lead to a shock in the administering flight attendant and jeopardize the safety of the entire aircraft." Alton Aff. ¶ 7. Spirit also provides a copy of its Flight Attendant Manual, which provides the following warning on the use of an AED on an adult: "Do not use AED on a victim lying on a conductive surface or in water." (*See* ECF No. 44-6, at 47).

The parties dispute whether Ms. Cardoza-Sori was actually wet or, if she was wet, whether Ms. Cardoza-Sori was so wet that flight attendants could not use an AED. Flight attendant Lisa Gaye Denback testified that Ms. Cardoza-Sori expelled "a lot" of urine, and "she was wet." Denback Dep. 81:13-24. Ms. Denback further stated that the flight attendants "could not dry her off. She was wet. Thoroughly wet." *Id*. at 83:14-21. Ms. Cuevas, the nurse who responded to the call for medical assistance, stated that she was "right on top" on Ms. Cardoza-Sori, but "did not notice" that she had expelled urine at any point. Cuevas Dep. 25:1-7. She testified that there was "no excessive moisture" on Ms. Cardoza-Sori. Id. at 25:9-14. She also stated that Ms. Cardoza-Sori's "level of moisture" would not have prevented her from using an AED. *Id*. at 25:16-20.

The parties also dispute whether flight attendants could have moved Ms. Cardoza-Sori so

she was not touching metal. Flight attendant Denback stated that flight attendants were able to "get [Ms. Cardoza-Sori] on the seat," but she remained in contact with several metal parts, including the seat belts and armrests. *Id*. at 81:4-12. Ms. Denback also testified that at least four people, including male personnel, tried to move Ms. Cardoza-Sori to the floor, but were unable to do so because of her weight. *Id*. at 82:19-83:23. Moreover, Ms. Denback testified that, even if they could have moved Ms. Cardoza-Sori to the floor, she would still have been in contact with metal parts of the seats due to her size.³ *Id*. at 85:5-24. Ms. Cuevas stated that she and the flight attendants moved Ms. Cardoza-Sori from a sitting position in her seat to lying down across all three seats in a row. Cuevas Dep. 25:2-15. According to Ms. Cuevas, she and the other flight attendants did not have any difficulty moving Ms. Cardoza-Sori. *Id*. at 27:5-18. Unlike Ms. Denback, Ms. Cuevas stated that she was "sure" she and the other flight attendants could have moved her to the floor; it was not "totally impossible." *Id*. at 27:5-11.

There are also genuine issues of material fact with respect to the third event Plaintiff identifies. Plaintiff argues that Spirit's failure to divert to a "closer" airport, rather than continuing to the flight's intended destination, Fort Lauderdale-Hollywood International Airport, constitutes an "accident" under the Montreal Convention.⁴ Spirit contends this does not constitute an "accident"

---

³ Ms. Cuevas identified Ms. Cardoza-Sori as "a little chunky, not extremely large" and estimated her weight at "a good 240." Cuevas Dep. 26:10-12.

⁴ Spirit cites *Krys v. Lufthansa German Airlines*, 119 F.3d 1515 (11th Cir. 1997) for the proposition that no "accident" occurs when a passenger alleges that the flight crew's failure to divert or make an unscheduled landing caused or enhanced a plaintiff's injuries. Def. Mot. 9. Indeed, in *Krys*, the Eleventh Circuit reasoned that because the plane continued on its normal, scheduled flight plan, there was no "unexpected or unusual event" that caused the plaintiff's injury. 119 F.3d at 1522 ("[L]ooking solely to a factual description of the aggravating event in this case-i.e., the continuation of the flight to its scheduled point of arrival-compels a conclusion that the aggravation injury was not caused by an 'unusual or unexpected event or happening that is external to the plaintiff.'"). The Supreme Court, however, has since indicated in *dicta* that failure to divert from a normal flight plan may constitute an "accident":
> Suppose that a passenger on a flight inexplicably collapses and stops breathing and that a medical doctor informs the flight crew that the passenger's life could be saved only if the plane lands within one hour. Suppose further that it is industry standard and airline policy to divert a flight to the nearest airport when a passenger otherwise faces imminent death.

because the pilots made the "prudent choice" considering the amount of time it would take to descend into an alternate airport, the amount of taxi time on the ground, the lack of a guaranteed runway in an alternate airport, and the availability of medical care on the ground. Leppard Aff. ¶¶ 4-7. According to Mr. Dale L. Leppard, a pilot with almost 50 years of experience, the Fort Lauderdale airport "was the best choice for the pilots." *Id*. ¶ 6.

Plaintiff disputes that Fort Lauderdale was the best airport for the plane to land. Plaintiff submits evidence that Spirit's company policy requires pilots to obtain advice from an onboard physician or a MedLink physician in order to make a decision to divert the plane. Walters Dep. 30:18-22. The pilots did not discuss the possibility of diverting the plane with a MedLink physician. *Id*. at 34:23-35:2. First Officer Walters stated that the Captain declared an emergency to air traffic control when the plane "was about 140 miles off the coast of Florida. Just past the – just past Nassau." *Id*. at 33:14-18. Plaintiff points to this evidence, among other things, in support of his contention that the pilots should have landed in Nassau instead of continuing on to Fort Lauderdale.

"Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003). Because there is conflicting evidence on whether Spirit flight attendants' failure to use the AED was "unexpected or unusual," and on whether the pilots' decision to continue on to Fort Lauderdale instead of landing in Nassau or Miami was "unexpected or unusual," summary judgment is not proper. Whether an "accident"

---

If the plane is within 30 minutes of a suitable airport, but the crew chooses to continue its cross-country flight, "[t]he notion that this is not an unusual event is staggering." *Olympic Airways v. Husain*, 540 U.S. 644, 656 (2004). I will therefore review the facts surrounding the pilots' decision to continue on the normal flight plan as part of my assessment of the circumstances of Ms. Cardoza-Sori's death. *See Saks*, 470 U.S. at 405 (definition of "accident" "should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries").

9

caused Ms. Cardoza-Sori's death — and consequently, whether Spirit is liable — involves disputed questions of material fact for the jury. *See Saks*, 470 U.S. at 406 ("In cases where there is contradictory evidence, it is for the trier of fact to decide whether an 'accident' . . . caused the passenger's injury.").

### IV. CONCLUSION

For the reasons provided, it is **ORDERED and ADJUDGED** that Spirit Airlines, Inc.'s Motion for Summary Judgment (ECF No. 44) is **DENIED** and Plaintiff's Motion for Partial Summary Judgment (ECF No. 46) is **DENIED**.

**DONE and ORDERED** in chambers, at Miami, Florida, this 15TH day of June 2011.

_____
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*William C. Turnoff, U.S. Magistrate Judge*
*Counsel of record*